UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| STACY MARIE OREWILER, | CASE NO. 1:20-CV-02589-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Stacy Marie Orewiler filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 18, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a report and recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Orewiler filed for DIB on August 24, 2017, alleging a disability onset date of November 2, 2016. (Tr. 75-76). Her claims were denied initially and on reconsideration. (Tr. 75-

1

86, 87-98). She then requested a hearing before an Administrative Law Judge. (Tr. 133-34). Ms. Orewiler (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 5, 2020. (Tr. 35-73). On March 25, 2020, the ALJ issued a written decision finding Ms. Orewiler not disabled. (Tr. 12-30). The Appeals Council denied Ms. Orewiler's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Orewiler timely filed this action on November 17, 2020. (ECF #1).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Orewiler and VE Klein, presented during the hearing before the ALJ.

Ms. Orewiler was born with a congenital cataract in her right eye. (Tr. 45). She is blind in her right eye and can see no light penetration in that eye. (*Id.*). She also has vision loss in her left eye, on the right side of the visual field. (Tr. 46). Ms. Orewiler has trouble focusing her left eye and experiences blurriness when changing focus. (Tr. 53). It can take up to five minutes for her vision to clear when changing focus from reading a paper to looking at her computer screen. (Tr. 53-54). Due to her vision impairments, Ms. Orewiler has never had a driver's license. (Tr. 45). Ms. Orewiler testified she has some difficulty moving around her home and will bump into doorways or trip over objects due to her vision problems. (Tr. 46). Ms. Orewiler experiences throbbing and piercing pain in her right eye nearly every day. (Tr. 52).

Ms. Orewiler testified she lives at home with her husband and eight-year-old son; she also has two older children who live on their own. (Tr. 42). Because of her vision impairments, Ms. Orewiler tries not to go to unfamiliar places. (Tr. 55). When she has to go to the store, she goes

2

with her husband or a close friend. (Tr. 55-56). Her companion will stay on her right side and will lead her through the store. (*Id.*). She has difficulty reading aisle signs due to the height, testifying, "[i]f I stand there and look at it long enough, it will adjust to where I can see it." (Tr. 56).

Ms. Orewiler has an associate's degree in medical coding and billing. (Tr. 42). She completed all coursework for her degree online. (Tr. 43). Ms. Orewiler did not use a special program to complete coursework, but did need to zoom in to 48- or 52-point font.[1]

From 2005 to 2016, Ms. Orewiler worked at Waycraft, a company teaching vocational skills to individuals with disabilities. (Tr. 43). Ms. Orewiler used a hand jack to load and unload product from trucks and set the product up. (*Id.*). She would then instruct the individuals with disabilities and teach them the skills necessary to prepare the product for distribution, such as placing light bulbs in paper sleeves and packaging in boxes to then be distributed in stores. (Tr. 44). This position required Ms. Orewiler to lift 25 to 35 pounds. (*Id.*). Ms. Orewiler had difficulty moving around her workstation while at Waycraft; she testified to several incidents in which she was hurt at work due to tripping over objects. (Tr. 46). She had to ask for assistance from others to avoid hurting herself. (*Id.*). Ms. Orewiler testified at the end of her employment she was having

---

[1]     Below is a to-scale visual representation of Ms. Orewiler's preferred font sizes.

# 48-point font

# 52-point font

increased trouble doing the work required of her position at Waycraft and had to ask for help more often. (Tr. 47). The company phased out her position due to the difficulties she had. (*Id.*).

Ms. Orewiler testified she attempted to find other work after her job at Waycraft ended, but she fell into deep depression. (Tr. 48). During that period, she cared for her children as much as she was able, sought treatment for her depression, and began taking online courses for her associate's degree. (*Id.*).

VE Klein then testified. He identified Ms. Orewiler's past experience at Waycraft as a composite position including production supervisor (DOT 922.687-058), light, skilled, SVP 7, and store laborer (DOT 922.687-058), medium, unskilled, SVP 2.[2] (Tr. 65). The job was performed at medium exertional level. (Tr. 66).

The ALJ presented the following hypothetical: a hypothetical individual who can perform light work, who can occasionally climb ramps and stairs, stoop, kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; can frequently handle and finger bilaterally; cannot work around hazards such as unprotected heights or work in proximity to exposed moving mechanical parts; and cannot engage in occupational driving. (Tr. 66). The VE responded that the hypothetical individual was precluded from performing Ms. Orewiler's past work. (*Id.*). However, the VE identified the following jobs the hypothetical individual could perform:

- Office cleaner (DOT 323.687-014): light, SVP 2, 60,000 jobs available nationally;

---

[2]     "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d). "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

4

- Produce weigher (DOT 299.587-010): light, SVP 1, 45,000 jobs available nationally; and

- Laundry bagger (DOT 920.687-018): light, SVP 1, 40,000 jobs available nationally.

(Tr. 66-67).

In response to a further  hypothetical limiting the individual to four hours of standing and walking in an eight-hour day, the VE testified that such an individual would be reduced to sedentary work. (Tr. 67). The VE identified the following sedentary jobs:

- Order clerk (DOT 209.567-014): sedentary, SVP 2, unskilled, 55,000 jobs nationally;

- Charge account clerk (DOT 205.367-014): sedentary, SVP 2, 55,000 jobs nationally; and

- Callout operator (DOT 237.367-014): sedentary, SVP 2, 45,000 jobs available nationally.

(Tr. 68). The VE testified if the individual required a sit/stand option at will, it would preclude all light work. (*Id.*). The individual could perform sedentary work only if the person could remain on task and would require a special accommodation to perform the work if not seated. (*Id.*).

The VE testified that employers tolerate up to ten percent of time off-task; anything greater than ten percent precludes any competitive work. (Tr. 68-69). Employers will permit one day per month absent; more than that generally precludes competitive work. (Tr. 69). The VE provided that his testimony regarding off-task time and absenteeism are based on his professional experience; neither the DOT nor the SCO address these topics. (*Id.*).

The ALJ then presented the following hypothetical:

If a person can't see well enough to avoid just ordinary hazards in the work place—boxes on the floor, pieces of equipment that might get moved around, as opposed to

5

the hazards that are defined in the SCO and DOT, would they be able to do any kind of work without a special accommodation?

(Tr. 69). The VE responded that an individual so limited could not do any work without a special accommodation. (*Id.*).

Ms. Orewiler's attorney followed up with a related question and had the following exchange with the VE:

> Q:    If the person is precluded doing any work that requires moving through the environment, is that sort of the same thing, as far as not being able to see ordinary hazards?
>
> A:    It is. I think it would preclude competitive work. There would be hazards to the individual and also maybe difficulty exiting the work place in case there's some type of emergency.

(Tr. 70).

Ms. Orewiler's attorney continued presenting questions to the VE. The VE testified if the first hypothetical individual (with the light RFC) were limited to occasional handling and fingering, there would be no competitive jobs available. (Tr. 70-71). If the individual required a one-hour break once per week (in addition to the 15-minute morning and afternoon breaks, and 30-minute lunch break), such a limitation would be work-preclusive. (Tr. 71). If the individual was off task during the transition from sitting to standing, sedentary work would be precluded. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Orewiler was 38 years old at the time of her alleged onset date, and 42 years old at the time of the administrative hearing. (Tr. 29). Ms. Orewiler completed high school and received an associate's degree in medical billing. (Tr. 29, 42). In the past, Ms. Orewiler has been employed in a composite position of Production Supervisor/Laborer, Stores. (Tr. 28).

6

### III.    MEDICAL OPINIONS[3]

On April 17, 2019, Ms. Orewiler underwent a consultative examination performed by Jon Cooperrider II, O.D. (Tr. 385-90). Dr. Cooperrider noted Ms. Orewiler's past medical history as congenital cataract, aphakia,[4] amblyopia,[5] and glaucoma on the right; no problems other than myopia on the left. (Tr. 385). Dr. Cooperrider recorded that Ms. Orewiler had no light penetration ("NLP") on her right. (*Id.*). On the left, Ms. Orewiler's uncorrected vision was 20/200 at distance and 20/40 reading at 16 inches; she had 20/20 vision with correction. (*Id.*). Ms. Orewiler's muscle function was abnormal. (*Id.*). Intraocular pressure was 23 on the right and 12 on the left.[6] (*Id.*). Glaucoma hemifield test ("GHT") results were outside normal limits on the left. (Tr. 390).

Dr. Cooperrider observed five abnormalities: (1) constant right esotropia (misalignment); (2) aphakia right; (3) pre-retinal fibrosis right; (4) keratic precipitate ("KP") right; and (5) vitreous floaters in both eyes. (*Id.*).

---

[3]    Ms. Orewiler only raises error as to the ALJ's treatment of Dr. Cooperrider's opinion, particularly in combination with hearing testimony from the VE and Ms. Orewiler. (Pl.'s Br., ECF #13, PageID 826-32). As such, she waives argument on issues not raised in the opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). I summarize only the evidence relevant to the claim Ms. Oreweiler has advanced, *i.e.*, Dr. Cooperrider's opinion.

[4]    Aphakia is the condition of not having a lens inside the eye. *American Academy of Ophthalmology*, *What Is Aphakia?*, https://www.aao.org/eye-health/diseases/what-is-aphakia (last accessed March 23, 2022). Aphakia symptoms include blurred vision, farsightedness, and the eyes can lose their ability to change focus between distances. *Id.*

[5]    Amblyopia, or "lazy eye," is when vision in one or both eyes does not develop properly in childhood. *American Academy of Ophthalmology*, *Amblyopia: What Is Lazy Eye?*, https://www.aao.org/eye-health/diseases/amblyopia-lazy-eye (last accessed March 23, 2022).

[6]    Intraocular pressure measures the fluid pressure inside the eye. *American Academy of Ophthalmology*, *Eye Pressure*, https://www.aao.org/eye-health/anatomy/eye-pressure (last accessed March 25, 2022). Normal eye pressure is generally between 10 and 20 mmHg. *Id.* Elevated eye pressure can damage the optic nerve; people can also lose vision even with eye pressure in the normal range. *Id.*

Dr. Cooperrider indicated Ms. Orewiler's visual fields were abnormal, and, as plotted, were consistent with findings. (Tr. 386). Dr. Cooperrider diagnosed Ms. Orewiler with nasal field loss of unknown cause on the left. (*Id.*). On the right, he diagnosed amblyopia and retina/lenticular/iris damage, glaucoma, and active uretic disease. (*Id.*).

In Dr. Cooperrider's opinion, Ms. Orewiler's vision impairments would affect her ability to perform work-related activities due to her status as a monocular patient with nasal field loss. (Tr. 386). He stated: "[p]otentially hazardous work not advised. Tasks which do not require binocularity and moving through environment are expected to be completed well." (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated March 25, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.  The claimant has not engaged in substantial gainful activity since November 2, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: right eye blindness, loss of visual field on the right side of the left eye, lumbar degenerative disc disease, bilateral carpal tunnel syndrome status post release surgeries, and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could occasionally climb ramps and stairs, stoop, kneel and crouch; frequently handle and finger bilaterally; never crawl or climb ladders ropes; cannot work around hazards such as unprotected heights, or work in proximity to exposed, moving mechanical parts; and

8

cannot engage in occupational driving. Due to lack of right eye vision, she can perform tasks that do not require binocular vision, peripheral vision on the right, or sharp depth perception such as is required to thread a needle.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on February 7, 1978 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from November 2, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

10

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

11

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

<h2 style="text-align:center">DISCUSSION</h2>

Ms. Orewiler presents one claim for review: The RFC is unsupported by substantial evidence because the ALJ did not properly evaluate Dr. Cooperrider's opinion. (Pl.'s Br., ECF #13, PageID 826). In support, she points to agency regulations requiring ALJs to consider five factors: supportability, consistency, relationship to the patient, specialization, and other factors, with the most important of these being supportability and consistency. (*Id.* at 827-32; *see also* 20 C.F.R. § 404.1520c(c)(1)-(5)). As Ms. Orewiler asserts, the ALJ did not explain the persuasiveness of Dr. Cooperrider's opinion grounded in the two "most important factors" of supportability and consistency, which the regulations require. (*Id.*).

In response, the Commissioner asserts the ALJ incorporated all of Dr. Cooperrider's opined limitations into the RFC. (Comm'r's Br., ECF #15, PageID 841). The Commissioner states that Dr. Cooperrider's opinion provides Ms. Orewiler "could perform tasks well that do not require binocularity *and* moving through an environment, indicating that she would perform jobs that require *both* elements less than well." (*Id.*) (emphasis in original). The Commissioner further posits that the ALJ accounted for the effect of Ms. Orewiler's visual impairments on her ability to move through the environment, because the ALJ limited Ms. Orewiler to work that does not require peripheral vision on the right. (*Id.*). From this, the Commissioner reasons Ms. Orewiler can show no harm from the ALJ's consideration of Dr. Cooperrider's opinion, because the

opinion does not clearly establish any greater limitation than that described by the ALJ. (*Id.* at PageID 841-42).

The Commissioner's assertions are unpersuasive. An ALJ may rely on the limitations contained in a medical opinion when forming the RFC, but is not required to adopt all opined limitations, even if she finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). When determining a claimant's RFC, regulations require the ALJ to explain and articulate their analysis and provide *justifiable* reasons in support of their RFC findings. *See* 20 C.F.R. 404.1520c(b); *see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). This Court will affirm under the substantial evidence standard if the Commissioner's findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. But an ALJ's failure to follow agency procedure "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakely*, 581 F.3d at 407 (internal quotations omitted). An ALJ's failure to follow agency procedures is not harmless error when it prevents this Court's meaningful review. *Id.*; *see also Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 440 (6th Cir. 2018). Therefore, by asserting the ALJ failed to follow agency procedure, Ms. Orewiler has demonstrated harm.

Because Ms. Orewiler filed her application after March 27, 2017, her case is evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [her] impairment(s) and whether [the claimant has] one or more impairment-related

limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[7] and consistency.[8] 20 C.F.R. § 404.1520c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). In the decision, the ALJ is required to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ assessed Ms. Orewiler with the following RFC:

[Ms. Orewiler] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could occasionally climb ramps and stairs, stoop, kneel and crouch; frequently handle and finger bilaterally; never crawl or climb ladders ropes; cannot work around hazards such as unprotected heights, or

---

[7]   "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[8]   "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

work in proximity to exposed, moving mechanical parts; and cannot engage in occupational driving. Due to lack of right eye vision, she can perform tasks that do not require binocular vision, peripheral vision on the right, or sharp depth perception such as is required to thread a needle.

(Tr. 22).

In support of this RFC, the ALJ considered Dr. Cooperrider's opinion as follows:

I have also considered the April 17, 2019 opinion of consulting ophthalmologist Dr. Cooperrider in arriving at the visual limitation established in the above residual functional capacity. According to Dr. Cooperrider indicated [*sic*] the claimant had monocular vision with nasal field loss and opined that potentially hazardous work was not advised. He also indicated that it was expected that the claimant could complete tasks not requiring binocularity and moving through the environment well (Ex. 12F). I find the doctor's opinion persuasive in that it can be interpreted as precluding work around hazards overall as those are defined in the DOT/SCO. However, I do not find it to mean that the claimant was precluded from working around ordinary work situations such as boxes on the floor, or equipment that has been moved. Her own doctor noted that she was only visually limited in the right eye. Moreover, the claimant worked in a warehouse setting with the same visual limitations and was able to avoid such ordinary situations for many years. While the claimant's visual field loss in the left is severe in combination, that loss is only in the nasal area on the left. While the loss of visual field in the left eye does impact her ability to have peripheral vision on the right, and would be expected to impact depth perception, the limitations set forth in the above residual functional capacity adequately accommodates these limitations. Given the foregoing, and the claimant's testimony I find persuasive, I find there is no basis to adopt any more stringent limitations.

(Tr. 27-28).

Ms. Orewiler asserts the ALJ did not ground her decision in the supportability and consistency factors, and any reasons given are poorly explained, internally inconsistent, and mischaracterizations of the evidence. (Pl.'s Br., ECF #13, PageID 827-32). Ms. Orewiler also notes the ALJ's omission of an explanation as to how the ALJ considered the supportability and consistency factors. (*Id.* at PageID 831). The Commissioner opposes Ms. Orewiler's claims, stating the ALJ did ground her decision in terms of supportability and

consistency—but notably, does not point the Court to the portions of the ALJ's decision proving this assertion. (Comm'r's Br., ECF #15, PageID 840).

The ALJ does provide some minimal explanation for her evaluation of the consistency factor. (Tr. 27-28) ("Her own doctor noted that she was only visually limited in the right eye. Moreover, the claimant worked in a warehouse setting with the same visual limitations and was able to avoid such ordinary situations for many years"). I agree with Ms. Orewiler that this explanation is deficient and does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d 877.

I note, for example, the ALJ concedes that "the claimant's visual field loss in the left is severe in combination" such that it would affect Ms. Orewiler's peripheral vision on the right. (Tr. 28). But the ALJ asserts that "the limitations set forth in the above residual functional capacity adequately accommodates these limitations." (*Id.*). Notably missing from the RFC, however, is any mention of Ms. Orewiler's left eye impairments. (*See* Tr. 22). The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The failure to include Ms. Orewiler's loss of visual field in her left eye in the RFC is not appropriate to her abilities, and is not remedied by the ALJ's otherwise unsupported assertion that it was sufficiently incorporated in the RFC vis-à-vis the right eye impairments.

I also note Dr. Cooperrider advised against "potentially hazardous work" and limited Ms. Orewiler to "[t]asks which do not require binocularity and moving through environment." (Tr. 386). And, at the hearing, responding to a question from the ALJ, the VE testified an individual

would not be able to do any work without a special accommodation if the person could not see well enough when moving around their environment to avoid ordinary hazards in the workplace such as boxes on the floor or equipment that has been moved. (Tr. 69). The VE further testified that precluding an individual from moving through the environment would also preclude competitive work, because "[t]here would be hazards to the individual and also maybe difficulty exiting the workplace in case there's some type of emergency." (Tr. 70). Ms. Orewiler also testified to the inability to avoid hazards at work, at home, and at the grocery store. (Tr. 46, 55). She required assistance from coworkers, her husband, and a friend to lead her through her environment, help her avoid tripping hazards, and keep from hurting herself. (Tr. 46-47, 55-56). In contrast, however, the ALJ states:

> I find the doctor's opinion persuasive in that it can be interpreted as precluding work around hazards overall as those are defined in the DOT/SCO. However, I do not find it to mean that the claimant was precluded from working around ordinary work situations such as boxes on the floor, or equipment that has been moved.

(Tr. 27). I am unable to reconcile that conclusion with the record evidence.

Finally, I note that Ms. Orewiler complained of blurry vision and that "it takes several minutes, 5 or so, for everything to, like, come into focus." (Tr. 54). Dr. Orewiler noted abnormal muscle function and floaters. (Tr. 385). Elsewhere in the record, Ms. Orewiler is noted as having made similar complaints to her eye doctor. (Tr. 635). Her doctor diagnosed her with presbyopia, or the gradual loss of the eye's ability to quickly focus on nearby objects. (Tr. 636). This issue is unaddressed in the ALJ's RFC analysis.

The ALJ's failure to discuss these issues, to explain her reasoning adequately, and her mischaracterization of testimony and evidence prevents any meaningful review and demonstrates a decision unsupported by substantial evidence. I therefore recommend the District Court reverse

17

the Commissioner's decision and remand for further proceedings consistent with this

recommendation. I further recommend the ALJ consider the ordinary environmental hazards that

might be present due to Ms. Orewiler's right eye blindness and left eye impairments, up to and

including obtaining a medical expert to testify at the hearing.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the

Commissioner's decision denying DIB not supported by substantial evidence and recommend the

decision be reversed.

Dated: March 25, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ.
P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted
objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation.** *Berkshire v.
Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific**

18

objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).